I am so sorry. You may proceed. Thank you. Good morning, your honors. May it please the court in opposing counsel. My name is Matt Munderloh and I am here this morning to represent the appellant, Luke LeFever. The briefing in this case is pretty extensive. We assigned a number of assignments of error. We don't think it's necessary at this point to get to any of them, but the first one, and that is the district court's refusal to appoint counsel to represent Mr. LeFever. Mr. LeFever made numerous requests for counsel to be appointed. He made a showing that he had reached out to multiple attorneys. Asking that they represent him. He received no response. Mr. LeFever asked for counsel at really critical stages of the case. And the most critical stage was when discovery was being done. So Mr. LeFever was incarcerated and he served multiple requests for production of defendants, he first also served requests for production of documents on non-parties and then found out that perhaps that was not the best way to do it. And so then he sought to serve a rule 45 subpoenas on those third parties. The appellants objected to those requests. It's really not known what documents and electronic evidence Mr. LeFever received. But didn't the district court deal with that? I think this is not a case where the district court said sink or swim, buddy. You know, you're in federal court and you got to follow the rules. My reading of the record is the district court said, I'm not going to appoint you counsel, but gosh, I'm going to give you a lot of leeway. I'm going to give you continuances. I'm going to help you out along the way. And that seems to me to take away a lot of the force of the argument for counsel. So there's no doubt that the district court granted Mr. LeFever a number of continuances to respond to the appellee's motion for summary judgment, and he wrote some, the court wrote some other things in its orders about offering to assist Mr. LeFever in obtaining the electronic evidence. That never really happened because the president didn't permit him to even look at the evidence that was used prominently by the appellees in their motion for summary judgment. And also concerning is the idea that Mr. LeFever was not able to meet and confer with appellees counsel when they objected to various discovery requests directed to them, and also when they objected to the proposed Rule 45 subpoenas that were to be served to agencies and other law enforcement officers that frankly were really critical to the case. What do we do with the fact, I understand those were, those were, those inhibited him, but what do we do with the fact that there's no, you know, I think you would agree with this, no constitutional right to counsel in a civil case. So really you're left with the argument, I really needed one and I couldn't effectively prosecute it. Right. So there is a handful of cases in this circuit that address the appointment of counsel being appropriate, really necessary when the person making the request needs counsel to appropriately investigate the facts of the case and litigate the issue of being able to conduct discovery the way it should be done. And so though there's no constitutional right, the case law suggests that counsel should be appointed when necessary to do discovery. And it was necessary here. And it's not just whether counsel will benefit Mr. And in this case, counsel would have benefited the court because the case would have been presented more thoroughly. So we have the videos and the appellees will stand up here in a moment and say, well, it doesn't really matter because we have the videos, the videos speak for themselves. There's nothing that counsel could have done to change the outcome of this case. And I'd suggest that that is just not true. The videos do not tell us what the officers who unloaded their firearms on Mr. Lefevre may have reasonably believed. The videos do not tell us what they reasonably perceived. There's other evidence out there that Mr. Lefevre didn't get because he didn't meet and confer from the walls of the prison that could help us with that issue. Now, that is an interesting argument. And if you look at our cases, Johnson and Reynolds, and, you know, we've never said that there was a requirement to show prejudice. But a couple of the other circuits have said that you have to show prejudice. And ordinarily, the way that people go around showing prejudice is said, look, these are the facts that we have subsequently discovered that would have been available that might have changed the analysis and we don't know what else is there. Two questions for you. One, should we include a requirement for showing of prejudice or is that improper? Just given the fact that if it's legally complex and you couldn't conduct a discovery, you should have, it's unfair to say that now on appeal, you've got to go out and have found something, you know, but second, if we do, have you discovered such a fact that you can point to and said, we found at least this and there may be a whole lot more out there. Well, so it's difficult to attempt to find evidence that would demonstrate that someone like Mr. Lefevre would be prejudiced by the time that the case is appealed, because there's just, there's no jurisdiction at that point for someone like Mr. Lefevre to be setting notices, to get subpoenas, and it would be difficult for anybody to do that, certainly for Mr. Lefevre or anyone else who's incarcerated. And so for that reason and that reason alone, I would suggest that prejudice in this kind of a case should never be a part of the standard because it would just be impossible to meet. It's like proving a negative. Yes, I understand the argument and that's why I pointed out that I wanted to address whether we should or should not. And then the second part of the question, you haven't had the opportunity to do any discovery, and so you have no idea exactly what would be out there. Is that what you're going to tell me? Correct, and so there was a lot more discovery to be done in this case. So it's clear that the district court in its order focused on what the officers, the appellees, what they reasonably believed and what they perceived as to whether or not Mr. Lefevre actually had a firearm. And there's lots of discovery yet to be done on that issue, and Mr. Lefevre tried to do it. So it's not just the appellees who were involved in this incident. There were multiple officers of agencies that the appellees are employed with and other agencies like the Gothenburg and Nebraska Police Department, not named as a defendant in this case, but they certainly were involved. So there could be, honestly not known, but there could be body cam videos from all of those officers. There could be dash cam videos from all of those officers where of course they would be discussing whether or not they think or have reason to believe that Mr. Lefevre had a firearm and whether he was the shooter. There's some evidence in the record about there being phone contact, not through dispatch, but just cell phone contact between the officers about whether Mr. Lefevre may have been armed. And the district court very much focused on it being, in the district court's view, reasonable for these appellees to fire dozens of shots at Mr. Lefevre and into his vehicle because those officers reasonably believed that he was armed. In reality, he wasn't, but because of the district court's focus on that issue, and specifically the court talks about it at page 46 of its order with respect to Mr. Lefevre, page 49 and 50 of its order with respect to the Lincoln County appellees. I thought that was only just one of the reasons. The other reason was he had led them on an hour chase up in Embankment and this and that and the other thing through cornfields or whatever it was, and then eventually they did a maneuver that stopped the car, but he started moving again. And so they were like, we don't want to put anyone else in danger by doing another 100 mile per hour chase. I thought that was the other part of the equation. So that is the other or another part of the equation. But when the district court talks about the appellees' actions being objectively reasonable, the district court focuses on both the vehicle and the firearm. It's unknown what the district court may have found if there were evidence that all of the appellees couldn't have reasonably believed that he actually had a firearm, then we're just left with the vehicle and no firearm at all. And so the question would be, were the officers acting objectively reasonable when they knew that Mr. Lefevre didn't have a firearm and he's just now in his vehicle? Quite frankly, he was in a field and moving slowly with no pedestrians around. But here's the issue. And I've got to think of the case. I think it's Plumhoff versus Ricard, where the court said that you can use the Supreme Court, you can use deadly force if somebody is essentially posing a danger to everybody else. And I guess what I'm really asking is, if we follow Plumhoff, doesn't that take care of that? Because then the gun becomes irrelevant. Then the gun becomes irrelevant because he would have posed danger with his car going 100 miles per hour again. And so Plumhoff says that's objectively reasonable to use deadly force at that point. So this case is distinguishable from Plumhoff for reasons argued in the briefing. And the main reason is, is that the driving behavior at the time that at least the last series of shots were fired at Mr. Lefevre is totally different than what the driving behavior was in Plumhoff. And this case was not cited in my brief, but I would encourage the court to look at a third-circuit case that was recently decided, Rush versus City of Philadelphia, 78 F. 4th, 6-10, 2023, decided in August of this year after the briefing was submitted. It does not follow Plumhoff, mostly because the driving behavior of the plaintiff or the plaintiff's representative, the plaintiff was killed by officers, the driving behavior by that person is very similar to the driving behavior of Mr. Lefevre while he's in the field moving his car slowly. The car toward the tail end before the last series of shots was fired is stopped and smoking, and yet we still have at least some of the appellees continuing with her fire. That's not objectively reasonable. The district court erred when it determined that it was. I am into my rebuttal and I will preserve the balance. Thank you. Could you file a 28-J letter on the Rush case? Yes, I would do that. Thank you. All right. Mr. Guinan. Good morning. May it please the court, counsel. I represent Deputy Ivan Castellanos. With regard to this issue on appointment of counsel, as you noted, that there is no constitutional right to appointment of counsel in a civil case, and that the court is given a broad discretion in deciding whether or not a counsel should be appointed. And there's criteria that the court goes through and the court went through in this case. The court found that this was not a complex case. It was, at least with my regard to my client, it was just excessive force in a false arrest claim under the Fourth Amendment, and there was a Fourteenth Amendment. So the due process claim that he was able to present his case. And in fact, you know, gave a pretty sophisticated presentation for a pro se plaintiff. And I've dealt with enough pro ses that this was actually really pretty good. Given all the time that he needed to present his opposition to our summary judgments, which was 146 pages, including briefing, evidence index, documents that we presented to them. What it comes down to is that third criteria is their conflict of evidence. Now, they point to the video saying, well, I didn't get a chance to look at the videos. But now the counsel has been appointed and they have looked at the videos, at least with regard to my client. They haven't pointed to any conflict of evidence between what the video shows and the court's application of the qualified immunity case law to that video. In particular, the excessive force claim. Underneath, you've got to remember that this was a pro se docket. So the judge went through on an order of claims, said that Mr. Lefebvre could go forward on certain claims, but he couldn't go forward on others. On the excessive force, he said, well, you've alleged that Ivan Castellanos tased you in the back as you were simply trying to walk away from this incident. But when you look at the video, what you see is that my deputy was trying to detain the gentleman so he can investigate drugs, which they don't dispute that he had reasonable suspicion to investigate, that he had probable cause to arrest him for DUS. And what the video shows is that he wasn't tased in the back while he was walking away. In fact, what had happened was he was actively resisting arrest, refusing orders to put his hands behind his back, refusing to be cuffed. And the only time after he was warned he was going to be tased if he continued resisted arrest, the taser happened when he actively lunged. It went after the taser from my deputy. The second tase happened after he was rolling around, still refusing commands and trying to grab the taser wires from him. The second theory that they had was the false arrest claim. Because remember what happened was after he got away, Mr. Lefevre, he went up and assaulted a homeowner, grabbed that UTV, stole a UTV from that homeowner and was driving away. My deputy, knowing that there was a gentleman at the end of the driveway with a young kid in a truck, fearful that the guy might get the truck and make a faster getaway, took a shot at the rear tire. Well, the theory was, under part of the false arrest theory was, is that my deputy was shooting at him on the getaway. And when you looked at the video, and now the counsel's looked at the video, they'd given up that whole theory that my guy took a shot at him to try to stop the fleeing. And without appealing that part of the decision from the court, admits that my guy was just trying to disable the UTV. Well, so then that goes to that radio call. He says, well, my theory is, and what he was allowed to go forward on under the order of claims from the lower court was, well, he yelled shots fired over the radio. And that somehow motivated these other officers to shoot him instead of other reasons. So he was allowed to go forward if he could prove that there was some ill motive in yelling shots fired. And if the shots fired by the other officers were the sole reason for the final arrest. And of course, after looking at the video now, he's not raised any conflict of evidence or any question of fact saying, well, okay, he admits now that they admit that it's not . . . You could argue today that there are other body cameras out there that have never been requested, perhaps, that they don't know anything about. And then, just so I don't . . . Yeah, I mean, I think that goes to the point on the conflict of evidence. Now, they're saying, hey, look, you just kick it . . . I'm sorry. I apologize. I had another question that the issue as to whether or not this case is factually or legally complex, you know, the court identified seven different issues and wrote an opinion that was, what, 47 or 49 pages long. Doesn't that, on its face, look like something that is complex enough that it's beyond the can of an ordinary prisoner? No, not when you distill it. I mean, the legal arguments come down, and I'm getting into Justin Hall's time. But I think the point is, is that he doesn't raise a question of fact that would have precluded summary judgment below, or that would ask the court to make a summary judgment finding, kicking it below. And that's important because if you kick the thing back on failure to appoint counsel without addressing the substantive issues as to whether or not there are questions of fact that should have been decided, then it just becomes harmless error on appeal. In other words, if they don't kick back with regard to my client that says that the video was wrong or the judge improperly applied case law to the video, that's law of the case below. Well, you should have had a counsel. But the law of the case is still, my guy didn't use excessive force and didn't make a false arrest claim. So the substance of the claim still has to be addressed. Well, what might happen, what could have happened isn't really the relevant issue. What would have changed in the lower court? In other words, in order to come to a summary judgment, what was the question of fact? And with my Deputy Castellanos, he hasn't cited any questions of fact that have come from that video and the judge's application of Eighth Circuit qualified immunity law since looking at that video. Thank you. Thank you. Mr. Hall. May it please the court, Justin Hollis is an attorney general from the state of Nebraska on behalf of Nebraska State Trooper Carlos Trevino. Luke Lefevre is an experienced pro se litigator who filed this case after leading law enforcement on a dangerous, lengthy, high-speed chase across western Nebraska, which ended by the use of reasonable force from Trooper Trevino. The district court held, correctly held that Trevino is entitled to qualified immunity for his actions. It also correctly held that Mr. Lefevre is not entitled to court-appointed counsel, and the court did not abuse its discretion in that case. Again, for the issue of counsel, it's an abuse of discretion standard. There is no right to counsel in a civil case. And this Court has mentioned the four-factor test for that counsel, including factual and legal complexity, ability of the indigent person to investigate facts, the existence of conflicting testimony, and the ability of the indigent person to present those claims. And I echo and repeat and join in on the arguments from Koa Peli, and I will not repeat most of his arguments. However, I'd like to point out certain things that Luke Lefevre did in his legal filings to the district court. He filed an original complaint. He filed an amended complaint, motions for default judgment. He filed a proper request for production of documents under Federal Rule 34. He filed a proper motion, I'm sorry, a brief in opposition to Trooper Trevino's motion for summary judgment. And in that document, he filed correctly the Rule 56 standards. He cited four other cases for that summary judgment standard. He cited facts with correct exhibits, page numbers, and paragraph citations. And he also cited the five further Federal cases to support his excessive force claim. Mr. Lefevre knew what he was doing and was able to conduct that research required to file that motion. What do we do with the fact that you heard opposing counsel say, well, that's great. I did do the — he did do the request for production. But then, unfortunately, because he was in jail or prison, he couldn't actually look at the request himself. And I respectfully disagree with opposing counsel on that, especially his comment regarding the meet and confer. There was never a request made by Mr. Lefevre for a meet and confer, but all, you know, personally, I would be willing to go to the prison and meet with Mr. Lefevre if that was something he chose to ask for. He had followed the Federal rules up until that point, and whether he was successful or not on a request for production of documents is something all lawyers face. Did he, during the course of the — prior to the ruling of the district court, did he inform the district court that he had been deprived access to a machine to play the video exhibits and was told that he couldn't do so without a lawyer? And did he inform the court that he was unable to access the prison law library? Your Honor, with respect to the first part of your question regarding the electronically stored information, he did make that request to the court, and he did bring up issues to the court. The court did provide him a roadmap, as this court indicated earlier, of how to go about looking at those videos. He could have made a request directly to the district court, and the district court, in its order, specifically said, if you have any issues with particular material through discovery that you're not allowed to view, you can request assistance through the court. He chose not to do so. He made a motion for counsel. When that was denied, he decided to do motions for reconsideration, which were improper under the Federal rules. Had he just asked the court for assistance, I believe the court would have done so. Again, not speaking for the district court. Regarding your second question regarding the prison library, Mr. Lefebvre had numerous continuances for that specific reason. He filed 11 continuances with the district court, each time saying he needed more time for the law library. He got an additional six months to respond to the motions for summary judgment. He filed 11 continuances between August of 2020 and July of 2022 for that specific reason, and each time the court was more than willing to give him that time to file. Because he is a pro se litigant in state custody. I see that I am running out of time, so I'd like to briefly mention that the only reason why it would be prejudicial to Mr. Lefebvre to not have counsel would be if he was not entitled to qualified immunity, or Trooper Trevino's not entitled to qualified immunity. He is entitled for qualified immunity for the actions that he took in this case, where the ramming of the vehicle and the shooting towards Mr. Lefebvre's stolen pickup truck. Again, Mr. Trooper Trevino fired those shots prior to the truck ending its chase, and he did that to protect the public. If there's no further questions, I would yield the remaining of our time to my co-appellee. Thank you. Thank you. Mr. Waite. Good morning, Your Honor. Thank you. My name is Terry Waite. I'm appearing on behalf of Lincoln County Sheriff Jerome Kramer, his Chief Deputy Raleigh Kramer, and a third member of the Law Enforcement Agency, Deputy Brett Schmidt. The fact is that this case went on for two and a half years. Judge Kuff was extraordinarily patient with the plaintiff, during which time we, the officers, still had the right to qualified immunity to be, to avoid, to be immune from this kind of harassing lawsuit. And that's what this is. As far as meet and confer is concerned, had he requested a meet and confer, that's most often done by phone in this day and age. If there's no requirement that somebody appear in person, do a meet and confer. The counsel for the appellant has not raised any inconsistency with Judge Kuff's over 80 specific paragraphs of findings that he made regarding the totality of the circumstances. By which the officer's actions should be viewed. The standard of review, of course, is modified by the admonition that if there's a consistent video, the light depicted upon the facts shown by the video is what the court should adhere to. And that's what happened here. Counsel for the appellant wants, or the appellant wants to point out that there were shots fired after the plaintiff had purportedly stopped. But these are separate law enforcement officers. Each is entitled to have his actions reviewed by the court. But, and those actions don't have to be perfect. This isn't a matter of, upon further review, we're going to play the video back 14 times and decide whether or not a football was held or not. This video shows in and of itself that the plaintiff had avoided the efforts to stop him. He wasn't just going through cornfields. He was going down the interstate, one of the busiest in the country. The wrong way at a hundred miles an hour, endangering people and population, and the deputies knew about that. The claim that there were no pedestrians once he got to the field, that's not accurate either. The fact of the matter is the video clearly shows that at least three law enforcement officers were on foot, that they were then pedestrians, that the plaintiff, even after being shot at, makes four significant accelerations, including one back at the officers, where he comes within 10 feet of them. At that point, Trooper Tovino empties his 14 rounds into the plaintiff's vehicle. One of the deputies, one of my clients, had been shooting at the tires when Trooper Tovino's bullets strike the plaintiff's vehicle, as noted by Judge Cuff. Apparently the back windows break out. At that point, these three officers who want to go home to their families that night, reasonably believe that they're in a gunfight and they act accordingly. They did shoot. There is a point in time where Trovino, who's got the body camera, says, vehicle stopped, but we pinpoint in our brief at page 17, that that was a matter of two to three, perhaps four seconds, during which time some additional shots rang out. Those, though, were admittedly from Deputy Schmidt, who says, I saw him lurch forward as if to grab a weapon. The officer said, reasonably, if he was armed, he'd been shown to be dangerous. He was armed with a vehicle, if nothing else, what he describes as a borrowed vehicle that he used as a weapon. And under these circumstances, the conclusion of Judge Cuff, that the should be entitled to qualified immunity because this all followed, the totality of circumstances all followed, two hours of an interaction with law enforcement officers, stealing, borrowing multiple vehicles, engaging in extremely dangerous behavior, a circuitous route that covered miles and miles across country, becoming airborne at a time or two in the field, evading the strips that the deputies had put down in an attempt to disable his vehicle. And at no time, at no time does Mr. Lefevre ever stop and signify any kind of surrender. He keeps moving right up to the very end and he doesn't stop. He doesn't surrender, doesn't try to get out of the vehicle. He just keeps going forward or backwards, back at the three deputies involved. In sum, Judge Cuff exercised a tremendous amount of patience, gave the plaintiff every opportunity to prove his case. And as Mr. Guinan points out, there's no appeal from the facts of the case. Those facts are the statement of the case. Thank you. Mr. Munderloh, you have a minute fifty-six for your rebuttal when you're ready. With all due respect to Appley's counsel, I think counsel is a little optimistic about Mr. Lefevre's ability to meet and confer about discovery disputes. So even I can't make a phone call to Mr. Lefevre. The chances of Appley's counsel being able to do that or otherwise personally meet and confer with him as the local rules in Nebraska require, I think are slim. And I think it's the Lincoln County Appley's in the record at appendix page 269, they tell the district court that even they can't meet and confer with Mr. Lefevre on discovery issues. And they made that statement, I think when they were late on responding to requests for admissions and Mr. Lefevre had filed some kind of a motion asking the district court to deem them to be admitted. One of the reasons why Lincoln County said that they were late is they would have met and conferred with Mr. Lefevre about that, but they weren't able to do that because he was in prison. I also heard a lot of argument about officers reasonably believing that they were in a gun fight with Mr. Lefevre. And that's really the crux of this. And that's what requires additional investigation, which is what discovery would get us. Deputy Castellanos said through dispatch that Mr. Lefevre had no firearm on him when he patted him down, when this all got started. So how we got to that statement from Deputy Castellanos to all of the other Appley's thinking, or in the words of the district court, reasonably believing that he had a firearm requires additional discovery. And that's discovery that Mr. Lefevre asked for, but wasn't able to do. Thank you, Your Honors. Thank you. The case has been.